PHILLIS H. CROMMETT ET AL., IN EQ.

*vs.*

CITY OF PORTLAND ET AL.

Cumberland.   Opinion, September 13, 1954.

218

*Arthur A. Peabody,* for plaintiff.

*Barnett I. Shur,* for defendant.

SITTING: FELLOWS, WILLIAMSON, TIRRELL, WEBBER, BELIVEAU, TAPLEY, JJ.

WILLIAMSON, J. On report upon an agreed statement of facts. This is a bill in equity to test the constitutionality of the "Slum Clearance and Redevelopment Authority Law." P. & S. L., 1951, Chap. 217, sometimes hereinafter referred to as the "Act" or the "1951 Act."

The plaintiffs are ten taxable inhabitants of the City of Portland and bring the bill under R. S., Chap. 95, Sec. 4, Par. XIII (1944). The defendants are the City of Portland, the members of the City Council, the City Treasurer, and five persons "in their purported capacity as Commissioners of the Slum Clearance and Redevelopment Authority."

The plaintiffs in substance seek to restrain and enjoin:

(1) payment of $60,000 by the city to the Authority, and

(2) the "purported" commissioners from accepting payments from the city and from exercising any powers under the 1951 Act. Further, the plaintiffs pray that the court decree that the resolution of the City Council creating the Slum Clearance and Redevelopment Authority and the council order authorizing the $60,000 payment are "illegal and invalid and that (the 1951 Act) is unconstitutional and void and in violation of the Constitution of this State."

A temporary injunction issued and is now in effect. At the hearing on the bill as amended, answer, replication, and an agreed statement of facts, the justice presiding, with the consent of the parties, reported the case to the Law Court for hearing and decision.

The issues are set forth by the plaintiffs in their bill as follows:

"FOURTEENTH: That Chapter 217 of the Private and Special Laws of Maine, 1951, is unconstitutional and void for the following reasons: (1) it authorizes the taking of private property for private use, in violation of Article I, Section 21 of the Constitution of the State of Maine and the Fourteenth Amendment to the Constitution of the United States; (2) it authorizes an unconstitutional delegation of legislative power, in violation of Article III, Sections 1 and 2, Article IV, Part First, Section 1, and Article IV, Part Third, Section 1, of the Constitution of the State of Maine; (3) it authorizes the loan of the credit of the State, in violation of Article IX, Section 14 of the Constitution of the State of Maine, and (4) it authorizes the expenditure of public funds for a private use contrary to the law of the State of Maine."

The pertinent constitutional provisions read:

"Private property shall not be taken for public uses without just compensation; nor unless the public exigencies require it."

Maine Const. Art. I, § 21.

"The legislature . . . shall have full power to make and establish all reasonable laws and regulations for the defense and benefit of the people of this state, not repugnant to this constitution, nor to that of the United States."

Maine Const. Art. IV, Part Third, Section 1.

". . . nor shall any State deprive any person of life, liberty, or property, without due process of law; . . ."

U. S. Const. Amend. XIV.

In considering in detail the 1951 Act and the facts in the instant case, it will be helpful to keep in mind the basic purposes and methods of the slum clearance and redevelopment program well stated in the following words:

"In essence, redevelopment contemplates the acquisition of a slum, blighted or deteriorating area selected in accordance with a general city or town plan, clearing, replanning and making the area available by sale or lease to private and public sources for redevelopment pursuant to a predetermined plan. Since the local agency will suffer a loss in acquiring, clearing and replanning the area for its new uses, federal grants are available to help meet the deficit, with the Federal Government absorbing two-thirds of the loss. As in the case of local annual contributions required under the United States Housing Act, the local contribution may be and undoubtedly will be in forms other than cash."

*The Federal Government and Housing* (1952) Wis. L. Rev. 581, 609.

We summarize the 1951 Act and set forth the provisions in which we are particularly interested.

"**Section 2. Findings and declaration of necessity.** It is hereby found and declared that there exist in the city of Portland slum and blighted areas (as herein defined) which constitute a serious and growing menace, injurious and inimical to the public health, safety, morals and welfare of the residents of said city of Portland; that the existence of such areas contributes substantially and increasingly to the spread of disease and crime, necessitating excessive and disproportionate expenditures of public funds for the preservation of the public health and safety, for crime prevention, correction, prosecution, punishment and the treatment of juvenile delinquency and for the maintenance of adequate police, fire and accident protection and other public services and facilities; that such areas constitute an economic and social liability, substantially impair or arrest the sound growth of said city of Portland; that this menace is beyond remedy and control solely by regulatory process in the exercise of the police power and can not be dealt with effectively by the ordinary operations of private enterprise without the aids herein provided; that the elimination of slum conditions or conditions of blight, the acquisition and preparation of land in or necessary to the development of slum or blighted areas and its sale or lease for development or redevelopment in accordance with the master plan and redevelopment plans of said city of Portland and any assistance which may be given by any state public body in connection therewith, are public uses and purposes for which public money may be expended and private property acquired; and that the necessity in the public interest for the provisions hereinafter enacted is hereby declared as a matter of legislative determination."

"**Section 3. Definitions.**

"(g) 'Blighted area' shall mean:

"1. An area in which there is a predominance of buildings or improvements which, by reason of dilapidation, deterioration, age or

obsolescence; or inadequate provision for ventilation, light, air, sanitation or open spaces; or high density of population and overcrowding; or the existence of conditions which endanger life or property by fire and other causes; or any combination of such factors, is conducive to ill health, or transmission of disease, or infant mortality, or juvenile delinquency and crime, and is detrimental to the public health, safety, morals or welfare.

"2. An area which, by reason of the predominance of defective or inadequate street layout; or faulty lot layout in relation to size, adequacy, accessibility or usefulness; or insanitary or unsafe conditions; or deterioration of site or other improvements; or diversity of ownership, tax or special assessment delinquency exceeding the fair value of the land, defective or unusual conditions of title; or improper subdivision or obsolete platting; or mixture of incompatible land uses; or the existence of conditions which endanger life or *proprety* by fire and other causes; or any combination of such factors, substantially impairs or arrests the sound growth of the municipality, or constitutes an economic or social liability and is a menace to the public health, safety, morals or welfare in its present condition and use.

"(h) 'Slum area' shall mean a blighted area in an extreme state of deterioration and decay.

"(i) 'Redevelopment project' shall mean any work or undertaking:

"(1) To acquire slum areas or blighted areas or portions thereof, including land, structures or improvements not in *themselved* deteriorated, the acquisition of which is necessary or incidental to the proper clearance, development or redevelopment of such slum or blighted areas or to the prevention of the spread or recurrence of slum conditions or conditions of blight;

"(2). To clear any such areas by demolition or removal of existing buildings, structures, streets, utilities or other improvements thereon, and to install, construct or reconstruct streets, utilities and site improvements essential to the preparation of sites for uses in accordance with a redevelopment plan.

"(3) To sell, lease or otherwise make available land in such areas for residential, recreational, commercial, industrial or other use or for public use, except for public housing, or to retain such land for public use, except for public housing, in accordance with a redevelopment plan. Public housing shall mean housing erected by a local housing authority in accordance with chapter 441 of the public laws of 1949.

"The term 'redevelopment project' may also include the preparation of a redevelopment plan, the planning, survey and other work incident to a redevelopment project and the preparation of all plans and arrangements for carrying out a redevelopment project."

"Section 4. Creation of slum clearance and redevelopment authority."

"Section 5. Powers of the Authority. The Authority shall constitute a public body corporate and politic, exercising public and essential governmental functions, and having all the powers necessary to carry out and effectuate the purposes and provisions of this law, including the following powers in addition to others herein granted:

"(d) . . . to enter into contracts with redevelopers of property containing *convenants*, restrictions and conditions regarding the use of such property for residential, commercial, industrial, recreational purposes or for public purposes in accordance with the redevelopment plan and such other covenants, restrictions, and conditions as the Authority may deem necessary to prevent a recur-

rence of slum or blighted areas or to effectuate the purposes of this law; . . .

"(i)   To prepare plans and provide reasonable assistance for the relocation of families displaced from a redevelopment project area to permit the carrying out of the redevelopment project, to the extent essential for acquiring possession of and clearing such area or parts thereof."

"**Section 6.   Preparation and approval of redevelopment plans.**"

"**Section 7.   Disposal of property in redevelopment project.**

"(a)   The Authority may sell, lease, exchange or otherwise transfer real property or any interest therein in a redevelopment project area to any redeveloper for residential, recreational, commercial, industrial or other uses or for public use in accordance with the redevelopment plan, subject to such covenants, conditions and restrictions as it may deem to be in the public interest or to carry out the purposes of this law; provided that such sale, lease, exchange or other transfer, and any agreement relating thereto, may be made only after, or subject to, the approval of the redevelopment plan by the city council. Such real property shall be sold, leased or transferred at its fair value for uses in accordance with the redevelopment plan, notwithstanding such value may be less than the cost of acquiring and preparing such property for redevelopment. In determining the fair value of real property for uses in accordance with the redevelopment plan, the Authority shall take into account and give consideration to the uses and purposes required by such plan; the restrictions upon, and the covenants, conditions and obligations assumed by the redeveloper of such property; the objectives of the redevelopment plan for the prevention of the recurrence of slum or blighted areas; and such other matters as the Authority shall specify as being appropriate. In fixing rentals and selling prices, the Authority shall

give consideration to appraisals of the property for such uses made by land experts employed by the Authority."

"Section 8. Eminent Domain. The Authority shall have the right to acquire all or any part of the real property, or any interest therein, within the redevelopment project area, by the exercise of the power of eminent domain, whenever it shall be judged by the Authority that the acquisition of said real property or the interest therein is in the public interest and necessary for the public use.

"(a) The necessity for such acquisition shall be conclusively presumed upon the adoption by the Authority of a resolution declaring that the acquisition of the real property, or interest therein, described in such resolution is in the public interest and necessary for the public use and that such real property, or interest therein, is included in an approved redevelopment project under this law . . ."

"Section 9. Acquisition and development of undeveloped vacant land. Upon a determination by resolution of the city council that the acquisition and development of undeveloped vacant land, not within a slum or blighted area, is essential to the proper clearance or redevelopment of slum or blighted areas or a necessary part of the general slum clearance program of the city of Portland, the acquisition, planning, preparation for development or disposal of such land shall constitute a redevelopment project which may be undertaken by the Authority in the manner provided in the foregoing sections. The determination by the city council shall not be made until the city council finds that there is a shortage of decent, safe and sanitary housing in the city of Portland; that such undeveloped vacant land will be developed for predominantly residential uses; and that the provision of dwelling accommodations on such undeveloped vacant land is necessary to accomplish the relocation in decent, safe and sanitary housing in said city of families to be displaced from slum or blighted areas which are to be redeveloped."

"Section 10.  Issuance of bonds.
"(b)  ... The bonds and other obligations of the Authority, and such bonds and obligations shall so state on their face, shall not be a debt of the city of Portland nor the state, and neither the city of Portland nor the state shall be liable thereon, nor in any event shall such bonds or obligations be payable out of any funds or properties other than those of said Authority acquired for the purposes of this law ..."

Sections 11, 12, and 13 relate to bonds of the Authority.

"Section 14.  Conveyance to federal government on default."

"Section 15.  Property of Authority exempt from taxes and from levy and sale by virtue of an execution.

"(b)  ... provided that with respect to any property in a redevelopment project, the tax exemption provided herein shall terminate when the Authority sells, leases or otherwise disposes of such property to a redeveloper for redevelopment."

"Section 16.  Cooperation by public bodies."

"Section 17.  Grant of funds by the city.  The city may grant funds to the Authority for the purpose of aiding the Authority in carrying out any of its powers and functions under this law.  To obtain funds for this purpose, the city may levy taxes and may issue and sell its bonds ..."

"Section 18.  Budget and annual report."

"Section 19.  Title of purchaser."

"Section 20.  Additional conferred powers."

Referendum clause.

From the agreed statement we find:

The 1951 Act was duly accepted by the voters of Portland in December 1951. The City Council in February 1952 de-

clared "that one or more slum or blighted areas exist . . . and that the redevelopment of such area or areas is necessary in the interest of the public health, safety, morals or welfare of the residents . . .", voted to authorize "a public body corporate and politic to be known as the Slum Clearance and Redevelopment Authority . . .", approved the exercise of the powers granted in the 1951 Act, and appointed commissioners of the Authority.

It is specifically agreed that "all of the steps required by (the 1951 Act) for the creation of the Slum Clearance and Redevelopment Authority and the entitlement of said Authority to transact business and exercise its powers have been taken and are completed."

Under the Housing Act of 1949 (42 U.S.C.A. § 1451 et seq.) the Federal Government may "to assist local communities in eliminating their slums and blighted areas and in providing maximum opportunity for the redevelopment of project areas by private enterprise . . ., make temporary and definitive loans to local public agencies for the undertaking of projects for the assembly, clearance, preparation, and sale and lease of land for redevelopment." Capital grants may also be made to enable the local "agencies to make land in project areas available for redevelopment at its fair value for the uses specified in the redevelopment plans: . . ."

The Federal Government has reserved $395,000 for capital grants in Portland, has advanced $14,787 used by the Authority in preparation of preliminary plans and surveys leading to the selection of a project area, designated as the Vine-Deer-Chatham Project Area, and has allocated to the Authority $14,427 for preparation of final plans and surveys of the project.

The capital grant, we read in the agreed statement, "will be in an amount not exceeding two-thirds of the net cost of redeveloping the project provided that the City of Portland

will provide the remaining one-third net cost by the provision of 'local grants-in-aid', which may be in the form of (1) cash grants, (2) donations of land and demolition or removal of site improvements, and (3) the provision of parks, playgrounds and public buildings or facilities necessary to support the new uses of the land in said project area in accordance with the redevelopment plan, and that in connection with said Vine-Deer-Chatham project the City of Portland will provide specific 'local grants-in-aid' in the form of cash, donation of land, and certain site improvements, and said City has appropriated a sum of Sixty Thousand ($60,000.00) Dollars as a local cash 'grants-in-aid.' "

After stating findings upon the physical characteristics of the project area "of 5.49 acres which is predominately residential but contains some commercial and industrial uses and some vacant land" disclosed in "recent extensive surveys," the agreement of facts continues with a comparison in recent periods of certain conditions within the area and within the entire city. The rate is given here for the area in terms of the city average: juvenile delinquency 4.2; tuberculosis 2.3; arrests for drunkenness 3.6; fires 4.4; social welfare contacts 1.5 to 2.7; active recipients of welfare from the city 5.25.

In October 1953 the Authority found, determined and declared the Vine-Deer-Chatham Project Area a blighted area within the 1951 Act.

"That it is the intention of the Slum Clearance and Redevelopment Authority and the City of Portland with the financial assistance of the United States of America to prepare and adopt or cause to be prepared and adopted a redevelopment plan for such project area and (1) to acquire by purchase or eminent domain all of the land, structures, and improvements in the Vine-Deer-Chatham Project Area, including structures and improvements not in themselves deteriorated, but excepting certain buildings whose present

use conforms to plans for the redevelopment of this area, (2) to clear said Project Area by demolition or removal of existing buildings, structures, streets, utilities and other improvements thereon, and to install, construct, and reconstruct streets, utilities, and site improvements considered essential to the preparation of sites for uses in accordance with a redevelopment plan, and (3) to sell, lease, and otherwise make available to individuals and private or public corporations the land in said project area for commercial, industrial, or other use."

The activities set forth above are necessary for the redevelopment of the project area as contemplated by the Authority and the city. The $60,000 authorized to be paid by the city will constitute a portion of the local grants-in-aid. Unless restrained, the City Treasurer will pay and the Authority will expend the authorized $60,000.

The issue on which the case hinges is whether clearance and redevelopment of the blighted area, known as the Vine-Deer-Chatham Project Area, under the 1951 Act is a *public use* within the meaning of our State constitution. If it is a public use, then the expenditure of public money and the taking by eminent domain are constitutional, otherwise not.

We may at the outset eliminate certain of the issues raised in the fourteenth paragraph of the bill, *supra*.

*First:* If the proposed action passes the hurdle of the State constitutional provision with respect to eminent domain, we need not consider the 14th Amendment to the Constitution of the United States. We may safely say that the provisions of our state constitution are not of a broader scope than the 14th Amendment. The judgment of the highest court of a state upon what should be deemed a "public use" is entitled to the highest respect. *Jones* v. *City of Portland,* 245 U. S. 217, 221 (1917).

*Second:* There is no unauthorized delegation of legislative power under the 1951 Act. Assuming the constitutional right in the State to expend public money and to exercise the right of eminent domain, the Legislature may entrust the power to instruments of its choosing, as here the City of Portland, a municipal corporation, and the Slum Clearance and Redevelopment Authority, "a public body corporate and politic, exercising public and essential governmental functions." Section 5 of 1951 Act. *Riche* v. *Bar Harbor Water Co.,* 75 Me. 91 (1883) ; *Ulmer* v. *Railroad Co.,* 98 Me. 579, 57 A. 1001, 66 L. R. A. 387 (1904) ; *Brown* v. *Gerald,* 100 Me. 351, 61 A. 785 (1905) ; *Hayford* v. *Bangor,* 102 Me. 340, 66 A. 731 (1907) ; *Bowden* v. *York Shore Water Co.,* 114 Me. 150, 95 A. 779 (1915) ; *Roberts* v. *Water District,* 124 Me. 63, 126 A. 162 (1924) ; *Smith* v. *Power Co.,* 125 Me. 238, 132 A. 740 (1926).

*Third:* The complaint that the 1951 Act authorizes the loan of the credit of the state is answered by the provision of the 1951 Act expressly stating otherwise. See Section 10 of 1951 Act, *supra.*

There are certain basic principles upon which all are agreed. First: Taxation must be for a public purpose or use, i.e., for the "benefit of the people," and a taking by eminent domain "for public uses." Maine Constitution, *supra.*

For our purposes it is unnecessary to distinguish "public use" in taxation from "public use" in eminent domain. The latter has been held to be much more restricted in meaning than the former. *Opinion of Justices,* 118 Me. 503, 513, 106 A. 865 (1919). It is apparent that without the right of eminent domain the purposes of the Act cannot be carried out. Accordingly, the constitutionality of the Act may be tested by reference only to the principles of the law of eminent domain. Without eminent domain the Act fails; with it, the public use or purpose of taxation is established.

Second: "Whether the public exigency requires the taking of private property for public uses is a legislative question, the determination of which by the legislature is final and conclusive. . . . Whether the use for which such taking is authorized is a public use is a judicial question for the determination of the court." *Kennebec Water District* v. *Waterville,* 96 Me. 234, 241, 52 A. 774, 777 (1902) ;. *Ulmer* v. *Railroad Co., supra; Brown* v. *Gerald, supra.* Third: Whether a given use of public moneys is public in nature is a matter for determination by the courts. *Private use: Allen* v. *Inhabitants of Jay,* 60 Me. 124 (1871) (loan by town to manufacturing concern) ; *Brewer Brick Co.* v. *Brewer,* 62 Me. 62 (1873) (exemption of manufacturing plant from taxation). *Public use: Laughlin* v. *City of Portland,* 111 Me. 486, 90 A. 318 (1914) (Portland municipal fuel yard) ; *State of Maine* v. *Vahlsing, Inc.,* 147 Me. 417, 88 A. (2nd) 144 (1952) (potato tax). Fourth: There is a strong presumption that a statute is constitutional.

In discussing the power of the Legislature, Justice Thaxter said, in *State of Maine* v. *Vahlsing, supra,* at page 430.:

"Unless it has clearly exceeded its constitutional powers in so doing, its action must be sustained. All rational doubts as to the constitutionality of statutes must be resolved in favor of the constitutionality thereof. Although it is the duty of the court to declare acts which transcend the powers of the legislature void, this judicial duty is one of gravity and delicacy and it is only when there are no rational doubts which may be resolved in favor of the constitutionality of the statute that the inherent power of the court to declare statutes unconstitutional should be exercised."

In the words of justice, later Chief Justice Cornish, in the *Laughlin* case, *supra,* at page 489 :

"The court is bound to assume that, in the passage of any law, the Legislature acted with full knowledge of all constitutional restrictions and in-

telligently, honestly and discriminatingly decided that they were acting within their constitutional limits and powers. That determination is not to be lightly set aside. It is not enough that the court be of the opinion that had the question been originally submitted to it for decision it might have held the contrary view. The question has been submitted in the first instance to the tribunal designated by the Constitution, the Legislature, and its decision is not to be overturned by the court unless *no room* is left for rational doubt. All honest and reasonable doubts are to be resolved in favor of the constitutionality of the act. This healthy doctrine is recognized as the settled policy of this court."

See also *Ulmer* v. *Railroad Co., supra,* and *Morris et al. Pet'rs.* v. *Goss,* 147 Me. 89, 83 A. (2nd) 556 (1951).

In applying the principles of law to the situation before us, we must keep in mind that the decisive question turns upon the meaning of "public use."

The Legislature has stated there are two public uses; first, the clearance of the "blighted area" as in the instant case, or the slum, and second, the redevelopment of the cleared area, under restrictions designed to prevent the recurrence of the "blight" or slum. This redevelopment may be accomplished by sale or lease of so much of the redeveloped area for private purposes as may not be utilized for public purposes, such as parks or schools. Section 7(a) of the Act, *supra.*

The clearance of the "blighted area" in our view is the use of property for purposes of public health, morals, safety and welfare. The "public use" within the meaning of our constitution lies in the removal of breeding grounds of disease, juvenile delinquency, and other social evils.

"The elimination of slums can be found to be a direct benefit and advantage to all of the people, to be a matter not readily approached through pri-

vate initiative but demanding co-ordinated effort by a single authority, to be in line with the purposes of promoting the public safety, health and welfare for which the government of the Commonwealth was established, and to require for its successful accomplishment the exercise of the power of eminent domain. It may well be deemed to rise to the dignity of a public service."

*Allydonn Realty Corp.* v. *Holyoke Housing Authority,* **304** Mass. 288, 23 N. E. (2nd) 665 (1939).

With the "public exigencies" we are not as a court concerned. On this condition upon the exercise of the right to take property by eminent domain, the Legislature has spoken. It has declared in substance that regulatory measures designed to control the use of his property by an individual cannot remedy "the menace," and that the clearance and redevelopment of the infected area is necessary.

There is no element of private use in the removal of the conditions of blight. Great public purposes are thereby served and the entire community will benefit. For the moment we pass the question of redevelopment. If there is a "use" within the constitution the use is "public."

It is not necessary, in our view, that an active use be contemplated in a taking by eminent domain. The use may be negative in character. The prevention of evil may constitute a use, and as here a public use. Land may be taken to protect a public water supply, and so here land may be taken to protect the community against the destructive forces mentioned.

In determining whether a given use is public in nature, we must consider existing conditions. It was well said in the *Laughlin* case, *supra,* at page 492:

". . . what could not be deemed a public use a century ago, may, because of changed economic and industrial conditions, be such today. Laws which

were entirely adequate to secure public welfare then may be inadequate to accomplish the same results now."

In the recent case of *State of Maine* v. *Vahlsing, Inc., supra,* Justice Thaxter said, at page 426:

"Admittedly the line of demarcation between a public and a private use is not always easy to draw. Whether a use is public or private is a question of law for the court. This question must be determined by the application of established legal principles to the then existing facts."

We find nothing in the opinions of our court that require us to reach a different result. The principle that "public use" in eminent domain means use by the public, or employment by the public, in contrast with public advantage, is well and firmly established. *Opinion of Justices, supra,* at page 514; *Paine* v. *Savage,* 126 Me. 121, 136 A. 664 (1927) ; *Haley* v. *Davenport et al.,* 132 Me. 148, 168 A. 102 (1933).

In general, our cases deal with whether a proposed active use will be for public or private use. For example, a water storage reservoir to increase value and capacity of water powers, *Opinion of Justices, supra,* at page 508; protection of public water supply, *Bowden* v. *York Shore Water Co., supra;* a private logging road, *Paine* v. *Savage, supra;* a drain across a neighbor's land, *Haley* v. *Davenport, supra.*

The application of the "use or employment by the public" rule is less difficult or at least more readily apparent in cases where there is an active use of the property for a given purpose. If active use by the public in the sense that property of a public utility is so used, is an essential requirement under our constitution for the taking of property by eminent domain, then the State is helpless to take necessary action for purposes of public health, morals, safety or welfare. We do not believe that our constitution has so

limited the exercise of proper and necessary governmental functions by the Legislature. To this point, namely, the clearance of the blighted area, we find nothing unconstitutional in the 1951 Act.

The determination of whether an area is "blighted" or "slum" under the statute must rest upon facts directly bearing upon the public health, safety, morals or welfare. Consideration of other facts not so grounded, however, does not affect the validity of the finding, if the pertinent facts are in themselves sufficient to show the "blighted" or "slum" condition. The Vine-Deer-Chatham Project Area is properly a "blighted area" under this test.

Several of the conditions stated in the statute in clauses 1 and 2 of Section 3 (g) *supra,* and particularly in clause 2, do not in our view touch upon a public use. Examples are found in "faulty lot layout," "deterioration of site," "diversity of ownership," "defective or unusual conditions of title," "improper subdivision or obsolete platting," or "mixture of incompatible land uses." Nor are public uses involved in correcting a condition from which an area "substantially impairs or arrests the sound growth of the municipality, or constitutes an economic or social liability." The public use, as we have said, is found in the course of conditions harmful to the public health, safety, morals or welfare.

Further, we do not in this opinion pass upon the constitutionality of Section 9 of the Act, *supra,* relating to the "Acquisition and development of undeveloped vacant land." Our discussion is confined to the validity of the Act with reference to the action here taken and proposed.

After the clearance of the blighted area, the Authority is faced with the question of its future use. We have seen that the redevelopment of the area, with disposal of parts thereof for private use with restrictions to prevent recur-

rence of the blight, is a second purpose of the Act. Section 2, *supra.*

Taken alone, the redevelopment of a city is not, in our view, a "public use" for which either taxation or taking by eminent domain may properly be utilized.

However beneficial it might be in a broad sense, it would clearly be unconstitutional for the Legislature to provide for the taking of any area in a city for the purpose of redevelopment by sale or lease for private purposes. Such a proposal would amount to no more than the taking of A's property for sale or lease to B on the ground that B's use would be economically or socially more desirable.

In the instant case redevelopment of the "blighted area" is, in our view, a secondary or minor purpose. The first and main purpose of the Legislature is not to redevelop Portland, but to clear away blighted areas and slums and to prevent their recurrence. If the only uses for which a blighted area or slum may be put when cleared must be uses public in nature by the test of active employment as, for example, parks, playgrounds, schools, municipal buildings and the like, there would be no occasion whatsoever for the 1951 Act. A taking for such public uses requires no consideration of the problems of the slum or blighted area. In brief, the purpose of redevelopment is not the dominant purpose of the Act. Compare *Opinion of Justices, supra,* at page 513, "The dominant purpose here (water storage reservoir) is for private benefit and not for the 'benefit of the people,' and therefore the power of taxation to promote it does not exist," and *Bowden* v. *York Shore Water Co., supra,* in which it was held the real purpose of the taking was to serve a private use of protection of timberlands from fire, and not a public use of protection of a public water supply.

Property may be taken "for public uses" to carry out the main purpose of the Legislature under the 1951 Act. And

further, the facts show that the City Council and Authority have acted and propose to act in good faith to carry out such main purpose. See *Smith* v. *Power Co., supra.*

Plainly, redevelopment of the area is an essential purpose of the Act. It must be recognized that a large part of the area and perhaps as much as is now in private hands will return to private uses after the cleansing process of removal of the infection. From the disposal of the area to private uses the cost of the project will in part be recouped. The Federal Government, the Authority, and the city all have an interest in the future of the area from the viewpoint of total expense.

There will be, however, in the private uses within the area in the future this significant difference from the past. Under the Act it will be the obligation of the Authority to make suitable provision in disposing of the property for the purpose of preventing a recurrence of the evils eliminated. In a limited sense the *public use* of the area will continue. Private uses will be permitted, but only to the extent the purposes of public health, morals, safety and welfare benefited by the clearance of the area remain unaffected.

Without question, the Authority will be in the business of selling and leasing real estate within the area for private purposes. This situation arises only as a result of the public uses for which it acquired and cleared the area. The disposal of the property, particularly in light of required restrictions to prevent the recurrence of the evil conditions, is not an unreasonable method of returning to private use property no longer needed in its entirety by the Authority.

The constitutionality of slum clearance and urban redevelopment statutes alike in principle if not in detail with our 1951 Act is upheld by the great weight of authority in other jurisdictions. Only Florida and Georgia have taken a contrary view.

Typical cases are: *Ajootian* v. *Providence Redevelopment Agency,* 91 A. (2nd) 21 (R. I. 1952) (two judges dissenting) ; *Gohld Realty Company* v. *City of Hartford, et al.,* 104 A. (2nd) 365 (Conn. 1954) ; *Velishka, et al.* v. *City of Nashua, et al.* (N. H. 1954) ; *Belovsky* v. *Redevelopment Authority of Penna.,* 357 Pa. 329, 54 A. (2nd) 277, 172 A. L. R. 953 (1947) ; *Schneider* v. *District of Columbia,* 117 Fed. Supp. 705 (D. C. 1953) ; *Foeller* v. *Housing Authority of Portland,* 198 Ore. 205, 256 P. (2nd) 752 (1952) (includes citations to cases throughout the country) ; *Murray* v. *LaGuardia,* 291 N. Y. 320, 52 N. E. (2nd) 884 (1943) (special constitutional provision). *Contra: Housing Authority of City of Atlanta* v. *Johnson,* 209 Ga. 560, 74 S. E. (2nd) 891 (1953) ; *Adams* v. *Housing Authority of City of Daytona Beach,* 60 So. (2nd) 663 (Fla. 1952). Miscellaneous: 29 C. J. S. 823, 850, eminent domain, Sections 31, 64, on public use; 18 Am. Jur. 660 et seq. 680, eminent domain, Sections 36 et seq., 51, 52; 2 Nichols on Eminent Domain, Section 7.2 (3rd Ed. 1950) ; 2 Yokley Zoning Law and Practice, Section 196 et seq. (1953 Ed.) on urban redevelopment; 28 Tulane L. Rev. 96 (1953) (Public Purpose in Urban Redevelopment) ; 29 B. U. L. Rev. 318 (1949) (Urban Redevelopment) ; Summaries of Slum Clearance and Public Housing Decisions, Housing and Home Finance Agency Office of the Administrator Division of Law (Oct. 1949 and Second Supplement Jan. 1954).

The attack upon the constitutionality of the Slum Clearance and Redevelopment Authority Law fails.

*Bill dismissed without costs.*