ROSE WARREN
*vs.*
WATERVILLE URBAN RENEWAL AUTHORITY

Kennebec.   Opinion, May 12, 1965.

*Richard J. Dubord,*
*Lester T. Jolovitz,* for Defendant.

*Jerome G. Daviau,* for Plaintiff.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, JJ. SIDDALL, J., sat but retired before opinion was rendered. MARDEN, J., did not sit.

SULLIVAN, J. Defendant is a body corporate and politic created in Waterville, R. S., 1954, c. 90-B, where on November 26, 1963 the plaintiff was the owner of real estate which the defendant in the furtherance of an urban renewal project expropriated and appropriated by process of eminent domain. R. S., 1954, c. 90-B, § 6. By her complaint in this case the plaintiff seeks to have the defendant enjoined from asserting title or exercising dominion over such real estate for imputed illegalities in the condemnation procedure, averred to be of voiding effect.

The complaint, defendant's answer, interrogatories and responses, a deposition, affidavits, exhibits, pre-trial memoranda and orders and plaintiff's motion for a summary judgment present this case by report to this court for determination. The parties stipulate that no material facts are in dispute and that the only issues are of law.

To quote from the pre-trial record:

"- - - - The primary issue of law for determination is whether or not the purported taking of plaintiff's property by eminent domain is lawful and valid and is legally sufficient to divest the plaintiff of her legal title - - - - They, (the parties), further agree that if the plaintiff prevails the Court may cause the defendant to be permanently enjoined from asserting title to plaintiff's property by reason of the purported taking by eminent domain on November 26, 1963; and that if the defendant prevails it may have judgment and the plaintiff may hereafter have her damages for the taking assessed in a separate proceeding now pending."

All of the events procreative of the controversy in the case at bar occurred during a period of time when R. S., 1954, c. 90-B was in controlling effect.

A municipality was privileged to create an urban renewal authority when and if its municipal officers adopted a resolution finding that:

"A.   One or more slums or blighted areas exist in such municipality; and

"B.   The rehabilitation, conservation, redevelopment, or a combination thereof, of such area or areas is necessary in the interest of public health, safety, morals or welfare of the residents of such municipality."

Subsequent to any such resolution and finding the municipal officers were directed to submit to the voters at a regular or special election the question whether the municipality willed to authorize the establishment of an Urban Renewal Authority.

R. S., 1954, c. 90-B, § 1

On November 3, 1959 six of the seven aldermen attended a programmed regular meeting of the municipal officers of the City of Waterville.   The mayor and one alderman were absent.

The municipal officers of Waterville were the mayor and aldermen.   R. S., 1954, c. 10, § 22, XXVI; c. 90-A, § 1, II.

A majority of the municipal officers had authority to act with committal of that body.   R. S., 1954, c. 10 § 22, III.

There were 8 "municipal officers" in Waterville.   Such officers did not consist of a mayor counterpoised against, vis-à-vis 7 aldermen or vice versa, but constituted a composite body to act by a numerical majority.   Were it otherwise a mayor by his absence or by his single vote might have vetoed or made unattainable any decision of the municipal officers.

"- - - - The municipal officers, of whom the mayor is one - - - - "
*Howard* v. *Harrington,* 114 Me. 443, 448.

At the meeting of November 3, 1959 an alderman was elected President.

"- - - - of this Regular Meeting in the absence of the Mayor and Permanent Chairman."

As Municipal Officers the 6 Aldermen in attendance adopted a resolution finding as follows:

"RESOLUTION

It is hereby resolved by the Municipal Officers of the City of Waterville that:

It is hereby found and declared that there exist in the City of Waterville one or more slum and blighted areas and the rehabilitation, conservation, redevelopment, or a combination thereof, of such area or areas is necessary in the interest of the public health, safety, morals or welfare of the residents of the City of Waterville."

The parties to this case have stipulated that at the meeting of the municipal officers "no evidence or statistics of any kind were presented or received" concerning the presence or absence in the area where plaintiff's real estate was situated, of many social deficiencies which occasion urban renewal efforts.

The resolution and finding of the Municipal Officers, it will be noted, were a mere truism and a generality predicated upon Waterville as a comprehensive territory without designation as to the specific location of any of the prevalent slum or blighted districts. The resolution and finding were expressed in copied statutory language as an inchoate measure. The pronouncement as given was obvious and self evident without necessity for statistics. In 1959 the observation would without doubt have been apt for most American cities. Furthermore, at least 4 of the 6 Alder-

men present and voting at the meeting of November 3, 1959 were familiar with the various areas of Waterville, had been resident in that City respectively for 10, 34, 38 and 50 years, were well acquainted with the general area comprising

"- - - - the Urban Renewal project in Waterville, and particularly Temple Court where properties of Rose Warren (plaintiff) are located, and knew that this area, as well as various other areas in the City with which I was (they were) acquainted, contained buildings which were old, deteriorating, and dilapidated; and Temple Court is a narrow street and is densely populated."

The record of the meeting of November 3, 1959 contains the following:

"IN BOARD OF ALDERMEN Order #88

ORDERED, That the following question be submitted to the voters of the City of Waterville at the next regular or special municipal election:

'Shall the City of Waterville adopt the provision of the urban renewal law, Revised Statutes, Chapter 90 - B, and Authorize the establishment of an Urban Renewal Authority?'

Passed in Concurrence."

At the same time on November 3, A. D., 1959 the 6 attending and functioning Aldermen as signatories executed a warrant for a plebiscite upon the questions recited above, to be conducted by vote at the regular municipal election on December 7, 1959. The referendum was accordingly held and the popular will answered by ballot the quoted questions in the affirmative. The record discloses that all provisions of R. S., 1954, c. 90-b, § 1, subsections II, III and IV were fulfilled.

On February 2, 1960 another programmed regular meeting of the municipal officers occurred. It was attended by

the Mayor and all 7 of the Aldermen. The Mayor "nominated" five citizens to serve staggered terms as the "Urban Renewal Authority" of Waterville and "It was so voted." Such action constituted an appointment in compliance with R. S., 1954, c. 90-B, § 2, subsection I which ordains that:

> "The municipal officers shall appoint a board of trustees of the urban renewal authority which shall consist of 5 trustees."

At the same meeting the Mayor appointed 15 persons as a Citizens' Committee of the Urban Renewal Authority. The Mayor and Chairman of the Planning Board were commissioned to contract with the Maine Department of Economic Development pursuant to the Federal Government's 701 Program administered by the U. S. Housing and Home Finance Agency "for the second phase of the comprehensive planning study of the City of Waterville, at a cost to the City" not to exceed $2500 and the withdrawal of that amount was authorized from the Planning Reserve Account.

During the 3 years to follow the Municipal Officers and the Urban Renewal Authority were continuously operative in the urban renewal enterprise. The Renewal Authority enlisted expert counsel and professional assistance. Its meetings were declared by it to be public. The Federal and State governments supplied cooperative guidance. Financial aids were obtained. The City had an adopted master plan for the development of the municipality and by July of 1962 the Waterville Urban Renewal Authority had prepared and recommended to the Waterville Planning Board an urban renewal plan which the latter body approved. R. S., 1954, c. 90-B, § 5.

Meanwhile the Municipal Officers met in many formal and informal sessions.

On January 21, A. D., 1963, pursuant to R. S., 1954, c. 90-B, § 5, subsec. VI, the Municipal Officers conducted in

the Opera House at the City Building a public hearing after statutory notice. Some 600 people were in attendance. The proposed "Maine R-6" Plan involving plaintiff's real estate was explained to the convened public by an expert. Specialists addressed the gathering. A considerable number of citizens proponents and opponents of the project spoke their opinions.

On February 5, 1963 the Municipal Officers met and by a 5 to 2 vote passed an Urban Renewal Resolution concerning "The Charles Street Project" "No. Maine R-6" where plaintiff's real estate was located. The Resolution which was read to the body by the Mayor stated inter alia that the Renewal Authority had made detailed studies of the project area in respect to conditions relating to physical, social, economic, safety, health and welfare factors, elements and circumstances and that the Municipal Officers had general knowledge of the conditions prevailing in the project area. The Municipal Officers in the Resolution averred that they found the project area to be blighted and eligible for correction under R. S., 1954, c. 90-B, §§ 1 and 4 and that the urban renewal plan for the project area had been duly reviewed, considered and approved by the Municipal Officers. R. S., 1954, c. 90-B, § 5, subsec. VII.

The Renewal Authority in its recommendations to the Municipal Officers had included the statements required by R. S., 1954, c. 90-B, § 5, subsec. V.

On November 26, 1963 at a regular meeting of the Waterville Urban Renewal Authority that body adopted a resolution declaring that the real estate of this plaintiff constituting a portion of the Charles Street Urban Renewal Project, Me. R-6 must be acquired in the public interest as necessary for the public use. The resolution proclaimed that plaintiff's property was included in an approved urban renewal project under R. S., 1954, c. 90-B and authorized the Chair-

man of the Authority to prepare, execute and file a Statement of Taking of plaintiff's real estate. On January 13, 1964 a copy of that Resolution with a plat of the real property of the plaintiff and a statement signed by Bradford L. Wall, Chairman of the Authority, communicating that such realty was taken pursuant to R. S., 1954, c. 90-B was filed in the Registry of Deeds for Kennebec County. The Authority filed in the Superior Court for Kennebec County a statement of the sum of money estimated by the Authority to be just compensation for the real estate taken from the plaintiff. The Authority deposited in such Superior Court to the use of the plaintiff bonds in the statutory amount. Notice of the taking of her real estate was served upon the plaintiff. R. S., 1954, c. 90-B, § 6.

Plaintiff contends that the defendant did not comply with all applicable provisions of R. S., 1954, c. 90-B and consequently the purported taking of plaintiff's realty by eminent domain was unlawful, null, void, without effect and violative of plaintiff's constitutional rights. Plaintiff who must sustain the burden of proof here protests multiple particularized acts and omissions as vitiative of the condemnation procedure.

Plaintiff mistakenly charges that on November 3, 1959 there was no authoritative or valid action by the Municipal Officers of Waterville. See R. S., 1954, c. 10, § 22, III and *Howard* v. *Harrington,* 114 Me. 443, 448, *supra.*

Plaintiff asserts that some or all of the persons acting as trustees of the Urban Renewal Authority were not valid, *de jure* office holders during much of the period from November 3, 1959 until November 26, 1963. The record discredits plaintiff's conclusions. On February 2, 1960 the Mayor and 7 Aldermen functioning as Municipal Officers chose 5 trustees for the Authority. R. S., 1954, c. 90-B, § 2, I. On October 4, 1960 at a regular meeting of the City

Government the Mayor read to the Joint Convention the resignation of trustee Weeks. The minutes of the meeting then record that the Board of Aldermen unanimously elected Bradford Wall as successor to trustee Weeks. The minutes then contain the words, "As Municipal Officers." On December 5, 1961 2 trustees resigned and the Mayor and City Council essayed to elect 2 successors. On January 31, 1962, 57 days later, all of the Municipal Officers at a special meeting appointed the same 2 persons as successor trustees and clarified or ratified the appointment of the other 3 trustees who had been serving as *de jure* trustees, 2 since February 2, 1960 and 1 since October 4, 1960. On February 5, 1963 at a regular meeting the record informs us that trustee Lander, Jr., was "reappointed as a member of the Urban Renewal Authority for a further term of five years, by Mayor Cyril M. Joly, Jr. The Aldermen consented to this reappointment."

R. S., 1954, c. 90-B, § 1, I, A and B require that the Municipal Officers in order to create for a municipality an urban renewal authority must preliminarily adopt

" - - - - a resolution finding that,

A. One or more slums or blighted areas exist in such municipality; and

B. The rehabilitation, conservation, redevelopment, or a combination thereof, of such area or areas is necessary in the interest of the public health, safety, morals or welfare of the residents of such municipality."

R. S., 1954, c. 90-B, § 20, II and XI, respectively, define the meaning of "Blighted area" and the meaning of "Slum area."

This court said in *Crommett* v. *Portland* (1954), 150 Me. 217, 235:

"The determination of whether an area is 'blighted' or 'slum' under the statute must rest upon facts

directly bearing upon the public health, safety, morals or welfare. Consideration of other facts not so grounded, however, does not affect the validity of the finding, if the pertinent facts are in themselves sufficient to show the 'blighted' or 'slum' condition."

On February 5, 1963 at a meeting of the Municipal Officers the Mayor read an Urban Renewal Resolution. It was moved and seconded that the resolution be acted upon. "All voted in favor of this motion." The Mayor "explained about the many meetings which had been held relative to Urban Renewal and also the two hearings." The Mayor "called for remarks from the citizens present." There was some discussion. 5 Aldermen voted to adopt and 2 Aldermen voted not to accept the: —

"Resolution of Municipal Officers of Waterville, Maine approving the Urban Renewal Plan and the feasibility of relocation for project No. Maine R-6."

The Resolution in part read as follows:

"1. That it is hereby found and determined that the Project is a blighted area and qualifies as an eligible Project area under State Statute Chapter 90-B, Sections 1 and 4, 1954, Revised Statutes of Maine."

As a preamble to the Resolution adopted the following is of record:

"Whereas the Local Public Agency has made detailed studies of the location, physical condition of structures, land use, environmental influences, and social, cultural and economic conditions of the Project area and has determined that the area is a blighted area and that it is detrimental and a menace to the safety, health and welfare of the inhabitants and users thereof and of the Locality at large, because of dilapidation, deterioration, age or obsolescence; or inadequate provision for venti-

lation, light, air, sanitation or open spaces; or the existence of conditions which endanger life or property by fire and other causes, and the members of this Governing Body have been fully apprised by the Local Public Agency and are aware of these facts and conditions;"
See R. S., 1954, c. 90-B, § 20, II, A.

The foregoing preamble, as does the statute cited, recites the manifestations of the blight in the alternative and not in the conjunctive. The preamble as a pleading would be technically objectionable. However, the preamble is intelligible, certain as to common intent and sufficient for all practical purposes.

*Soper* v. *Livermore,* 28 Me. 193, 203.
*State* v. *Williams,* 25 Me. 561, 565.

The deposition of the Executive Director of the Urban Renewal Authority represents that at a public hearing prior to February 5, attended by the Municipal Officers and at the public hearing on January 21, 1963 also attended by the Municipal Officers formal evidence was offered as to the constitution by the project area of a menace to public health and safety. The Director states that subsequent to December 6, 1960 blight factors were discussed by the Urban Renewal Authority with the Municipal Officers at different times and "certainly the visual view of the area in question, several times before the meeting was held where they voted on it."

The record in the case at bar contains an affidavit of Morton R. Braun a professional consultant for urban renewal projects. Braun whose services were engaged in the Waterville project recites that his employment was for the purpose of developing information as to the existing critical conditions of various areas of Waterville with a view to determine if such areas could be established as eligible for Federal planning and survey funds and if the areas were

found to be so qualified, ultimately to make specific plans for the urban renewal of such municipal areas. As a result of studies he asserts that he formed an opinion that the Charles Street area was one in which there was a predominance of buildings which were in fact dilapidated, deteriorated, aged and obsolete. In the residential area he listed instances to prove that there was a high density of population and overcrowding. He made or supervised a careful inspection of structures from the outside. He and his staff collected information in the field and made a detailed analysis of the areas involved. All such information so gained was interpreted and analyzed and resulted in various reports made to the Municipal Officers. He relates the nature and objects of his observations and those of his co-workers in their house to house survey as to structural conditions and envoronmental factors. He concluded that of 83 structures in the Charles Street Area Project 36 or 43% were substandard, warranting clearance, 29 or 35% were deficient but economic of repair and 18 or 22% were standard buildings. He found a number of environmental deficiencies. These facts concerning the Charles Street Area Project were made available by Braun to the Municipal Officers and to all present at the public hearing conducted by the Municipal Officers. During the course of preparing plans for the project Braun met on several occasions with the Municipal Officers to present progress reports, results of surveys and proposed plans. Braun with or without his working staff met with the Municipal Officers on January 28, 1960 and on several specific dates through the ensuing period inclusive of January 21, 1963 when he spoke at the public statutory hearing provided by the Municipal Officers. At all such meetings he represents that the entire results of the studies, surveys and plans which he had developed were given and explained to the people present.

The plaintiff in the instant case protests that:

"- - - - the finding of blight in the area designated was purely arbitrary and without factual foundation for adequate legal procedure."

Plaintiff in support of such contention cites from the text of this court's opinion in *Crommett* v. *Portland,* 150 Me. 217, 235, as follows:

"The determination of whether an area is 'blighted' or 'slum' under the statute must rest upon facts directly bearing upon the public health, safety, morals or welfare."

As we have previously noted herein the Municipal Officers supplied such findings as the statute required. R. S., 1954, c. 90-B, § 1, A and B. Plaintiff impugns those findings as "purely arbitrary and without factual foundation."

Plaintiff's attack upon the findings is in the nature of the erstwhile extraordinary and now regulated certiorari process which had been happily simplified and lightened by Rule 80 B, M. R. C. P. The serviceful utility and the evolved rationale of certiorari without its technical formularies have been conserved.

"- - - - It (certiorari) lies only to correct errors of law, not to review the decision of a subordinate tribunal of a question of fact submitted to its judgment. *Frankfort* v. *County Commissioners,* 40 Maine 389; *Hayford* v. *Bangor,* 102 Maine, 340; *Farmington River Water Co.* v. *County Commissioners,* 112 Mass. 206. In the last named case Gray, C. J., said: 'A writ of certiorari lies only to correct errors in law, and not to revise a decision of a question of fact upon the evidence introduced at the hearing in the inferior court, or to examine the sufficiency of the evidence to support the finding, unless objection was taken to the evidence for incompetency, so as to raise a legal question'." *Nelson* v. *Portland Fire Department* (1909), 105 Me. 551, 555.

" - - - - In a proceeding of this nature (certiorari) this court does not act as a Court of Appeal upon the merits of the cause. It cannot retry the facts nor review the evidence taken out before the municipal officers, nor reverse any decision within their discretion. It has power to examine the course of procedure and to determine whether the municipal officers kept within their jurisdiction, and proceeded according to law - - - - "
*State* v. *McLellan* (1918), 117 Me. 73, 79.

The Superior Court would not try *de novo* as a Court of Appeal the issue decided by the Municipal Officers as to whether the controversial area of Waterville was objectively "blighted." The Municipal Officers were a governmental or administrative body within the purview of R. S., 1954, c. 90-B. The function of this court upon agreed report is to examine the record, as it is afforded us here, of the proceedings before the Municipal Officers and to verify what information was presented to the Municipal Officers from November 3, 1959 and through February 5, 1963 when the Municipal Officers adopted the resolution finding and deciding that the area of Project No. Maine R-6 was blighted and qualified as an eligible urban renewal project area. This court thereby is to conclude whether upon the information possessed by them the Municipal Officers in finding a state or condition of statutory "blight" acted within the bounds of vindicable discretion or arbitrarily, capriciously and without justification.

" - - - - Trial de novo, in effect, could relegate the commission hearing to a meaningless, formal preliminary and place upon the courts the full administrative burden of factual determination."
*Nevada Tax Commission* v. *Hicks*, 73 Nev. 115, 123, 310 P. (2nd) 852, 856.

To the Municipal Officers the Legislature delegated the authority to make findings of "blight" under permissive circumstances.

Earlier in this opinion we demonstrated from the record in the case at bar that the Municipal Officers were provided with ample and abundant information to warrant a finding of "blight" in the milieu where plaintiff's real estate was located. They pronounced such a finding which is therefore final.

> "Nor is it required - - - that independent proof of detriment to public health, safety or morals be made. Once it is found that an area of slum and blight exists, and such finding rests upon evidence of substance, the consequent menace to public, health, safety and morals, follows as a matter of legislative determination - - - - "

> *Urban Renewal Agency of City of Reno* v. *Iacometti* (1963), (Nevada), 379 P. (2nd) 466, 473.

It is the conclusion of this court that the plaintiff has failed to sustain her burden of proof in this case and that the taking of plaintiff's property was lawful, valid and legally sufficient to divest the plaintiff of her title.

In accordance with this opinion and with the applicable alternative contained in the agreement of the parties the mandate shall be:

> *Injunction denied.*
>
> *Final judgment for the defendant.*
>
> *Plaintiff to have her damages for the taking of her property, assessed in a separate proceeding now pending.*