MARY A. RANDOLPH,
Plaintiff,

*vs.*

WILMINGTON HOUSING AUTHORITY, a body corporate and politic of the State of Delaware, and THE MAYOR AND COUNCIL OF WILMINGTON, a municipal corporation of the State of Delaware, Defendants.

*On Certification to Supreme Court, March 12, 1958.*

*Robert B. Walls, Jr.,* Wilmington, for plaintiff.

*Thomas Herlihy, Jr.,* and *Morris Cohen,* Wilmington, for defendant Wilmington Housing Authority.

*Stewart Lynch,* City Solicitor (of Hastings, Lynch & Taylor), Wilmington, for defendant Mayor and Council of Wilmington.

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, JJ., sitting.

SOUTHERLAND, Chief Justice (for a majority of the Court) : The Vice Chancellor has certified to us for answer questions touching the constitutionality of the *Slum Clearance and Redevelopment Act of 1951*, 31 *Del.C. Ch.* 45, §§ 4501-4503, and certain other related questions.

The act provides for the creation in each county and municipality of the State, with the approval of the governing body of the community, of a *"Slum Clearance and Redevelopment Authority."* § 4503.

The general purpose of the act is to provide for a program of slum clearance and urban redevelopment. To this end the Authority is empowered (§ 4516) to acquire title by purchase or condemnation to real property within any specified area in the community declared by the governing body to be a "slum area" or "blighted area" (as those terms are defined in § 4501 of the act), and to exercise the power of eminent domain for the purpose (§ 4528) ; to prepare and submit for approval a plan of redevelopment of that area, which shall include certain specified data (§ 4520) ; and to sell, lease, exchange or otherwise transfer any such real property to a redeveloper, subject to such conditions as may be appropriate to prevent the recurrence of a slum or blighted area (§ 4527).

The act contains detailed provisions respecting the content of any plan of redevelopment; the findings that form the basis of the plan; the public hearing on the plan; the financing of the cost of the plan by grants or loans from the governing body and from the federal government; and, in general, the procedure to be followed in the preparation, approval and execution of the plan. Power is expressly conferred on the governing bodies to levy taxes and appropriate money

for the purposes of the act (§§ 4536-4537). Such provisions as are especially pertinent to the questions presented will be hereafter set forth.

The agreed facts are as follows:

In 1951 the Wilmington Housing Authority (theretofore created) was designated as the Slum Clearance and Redevelopment Authority for the City of Wilmington.

By a series of resolutions of the Council of Wilmington, of the Authority, and of the Wilmington Planning Commission, adopted in 1955 and 1956, there has been approved a plan for the acquisition and redevelopment by the Authority of a certain area in Wilmington, sometimes called "Poplar Street Project A". The area contains 38.2 acres of land and includes 21½ city blocks in Wilmington lying east of the main business section. It contains some 638 structures, of which 606 are residential structures containing 970 dwelling units. School buildings and churches, and a settlement building, are excluded from the project.

In some of the resolutions of the Authority and of City Council this area is found and declared to be a "slum area", and in others to be a "slum and blighted area".

The statute defines a slum area as follows:

"'Slum area' means an area in which there is a predominance of buildings or improvements (or which is predominantly residential in character), and which, by reason of dilapidation, deterioration, age or obsolescence, inadequate provision for ventilation, light, air, sanitation, or open spaces, high density of population and overcrowding, or the existence of conditions which endanger life or property by fire and other causes, or any combination of such factors, is conducive to ill health, transmission of disease, infant mortality, juvenile delinquency and crime, and is detrimental to the public health, safety, morals or welfare." 31 *Del.C.* § 4501.

The data assembled from surveys of the area fully support the finding that the area is a "slum area". Of the structures in the area 97 per cent showed dilapidation or deterioration; 55 per cent have sub-standard alterations; 99 per cent have inadequate original construction; 97 per cent are improperly maintained; and 77.3 per cent have violations of the Fire Code. The proportion of persons in the area receiving public assistance is much higher than the proportion applicable to the rest of the city. Arrests for assault and disorderly conduct are proportionally much higher in the area than elsewhere. There are other findings that it is unnecesary to review in detail.

The plan provides:

1. The Authority will acquire, by purchase, condemnation, or otherwise, all the land in the area, except that excluded.

2. A plan of relocation of residents who will be dispossessed is attached, as required by the statutes.

3. The structures upon the land so acquired will be demolished and the land will be sold to the redeveloper at its then fair value. The area will then be redeveloped by private contractors in accordance with a prescribed site plan. The redevelopment will be subject to specified controls and restrictions designed to assure the completion of the redevelopment in accordance with the site plan and the uses and limitations specified in the plan of redevelopment.

4. Certain existing streets will be vacated and others laid out; and equipment for necessary additional utility services will be provided.

5. The estimated cost of the project is about $3,000,000, of which about $1,000,000 will be appropriated by the Council of Wilmington and the remainder by the federal government through a grant-in-aid under the federal housing acts.

Plaintiff's property is within the area. It is admitted that her building is not substandard, and is a safe and sound structure.

After the approval of the plan the City of Wilmington on January 24, 1957, entered into a contract with the Authority. The City has agreed to make a grant-in-aid of $1,000,000 toward the cost of the project. A temporary loan of $150,170 was made on January 27.

On June 13, 1957, the Authority entered into a contract with the Federal Housing Home and Finance Agency providing for the financing by that agency of approximately two-thirds of the cost of the project. On June 21 a temporary loan of $150,170 was made by the Agency.

On July 25, 1957, the Wilmington City Council adopted a resolution attempting to rescind the prior approval of the project and (by implication) its agreement with the Authority. The resolution recites that the agreement "should be invalid by reason of not having been negotiated by means which constitute due process of law."

Plaintiff's complaint in the court below, after reciting the facts, alleges that the Slum Clearance and Redevelopment Act and all proceedings taken thereunder are unconstitutional or illegal on various grounds. She prays for an injunction against further expenditure of public funds for the project and for an injunction to prevent the Authority from filing eminent domain proceedings against the plaintiff.

The defendants admitted the facts, and all parties moved for summary judgment.

Upon this record the court below has certified to us fifteen questions of law. These may readily be classified into seven groups raising seven points.

The first group of certified questions, (a) to (g), inclusive, is as follows:

"a. Is the Redevelopment Law, and particularly Sections 4527 and 4528 thereof, authorizing the acquisition and taking of private property by the Defendant Authority for the purpose of eliminating and redeveloping slum or blighted areas, unconstitutional as authorizing the taking of private property for private purposes in violation of Article 1, Sections 7 and 8 of the Constitution of the State of Delaware [*Del.C.Ann.*] and the Fourteenth Amendment to the Constitution of the United States which permit the taking of private property only for public purposes?

"b. Is the Redevelopment Law, and particularly Sections 4527 and 4528 thereof, authorizing the acquisition and taking of private property by the Defendant Authority for transfer to private persons, unconstitutional as authorizing the taking of private property for private purposes in violation of Article 1, Sections 7 and 8 of the Constitution of the State of Delaware and the Fourteenth Amendment to the Constitution of the United States which permit the taking of private property only for public purposes?

"c. Even if private property may be taken for any of the purposes set forth in a. and b., above, does such constitutional sanction include the taking of vacant property and safe and sound buildings and structures, such as plaintiff owns located within such slum and blighted area?

"d. Is the Redevelopment Law, and particularly Sections 4502, 4536 and 4537 thereof, authorizing the use of public funds and property by the Defendant City derived from taxation and from issuance of its bonds or otherwise, for the purposes provided in the said Redevelopment Law, including eliminating and redeveloping slum and blighted areas, unconstitutional as authorizing use of public funds for private purposes in violation of the Fourteenth Amendment to the Constitution of the United States and of Article 1, Section 7 of the Constitution of the State of Delaware and in violation of the intent and spirit of the said Constitution that public funds shall be used only for public purposes?

"e. Is the Redevelopment Law, and particularly Section 4537 thereof, and Chapters 500 and 501 of 50 *Del.Laws*, authorizing issuance of bonds by the Defendant City to provide funds for the purposes contemplated in said Redevelopment Law, unconstitutional as authorizing the provision and use of public funds for private purposes in violation of the Fourteenth Amendment to the Constitution of the United States and of Article 1, Section 7 of the Constitution of the State of Delaware and in violation of the intent and spirit of said Constitution that public funds shall be used only for public purposes?

"f. Is the Redevelopment Law, and particularly Section 4537 thereof, authorizing the Defendant City to levy taxes and to provide funds for the purposes of said Redevelopment Law, including the elimination and redevelopment of slum and blighted areas, unconstitutional as authorizing taxation for private purposes in violation of the intent and spirit of the Constitution of the State of Delaware?

"g. Is the Redevelopment Law, and particularly Sections 4530 and 4531 thereof, authorizing the issuance of bonds or other obligations by the Defendant Authority for the purposes provided in said Redevelopment Law, including the elimination and redevelopment of slum and blighted areas, unconstitutional as authorizing the use of public funds, thereby derived, for private purposes in violation of the Fourteenth Amendment to the Constitution of the United States and of Article 1, Section 7 of the Constitution of the State of Delaware, and in violation of the spirit and intent of such Constitution that public funds shall be expanded only for public purposes?"

Questions (a) and (b) present the real question in the case. Answers to the remaining questions in the group will depend upon the answer to the question embodied in (a) and (b).

The thrust of plaintiff's argument upon the validity of the slum clearance act is directed against the redevelopment provisions of the act. The ultimate use to which plaintiff's property is to be put, she

says, is redevelopment by private contractors. Such a use, she insists, is not a public use within the meaning of our constitutional provision. Slum clearance, she argues, is not a public "use" of the land, since slum clearance, like the abatement of a nuisance, could be accomplished by the exercise of the police powers. Therefore, she says, the validity of the act must be tested by determining whether redevelopment is a public use; and in resolving this question the term "public use" must be held to have a narrower meaning than "public benefit" or even "public purpose"; it contemplates that the ultimate use of the land must be a use by the State or other condemning authority. *Edens v. City of Columbia,* 228 *S.C.* 563, 91 *S.E.2d* 280, is cited.

This argument may be broken down into two contentions: first, that condemnation of property for slum clearance is not a public use; and, second, that in any event redevelopment is the primary or dominant purpose of the act.

Let us consider first the matter of slum clerance, and inquire: Is a taking of private property for the purpose of eliminating a slum a taking for public use?

■■ The grant of the power of eminent domain to eliminate slum areas is predicated upon certain legislative findings in § 4502 of the act, which may be summarized as follows:

That there exist in localities in the State slum areas which constitute a serious and growing menace, injurious to public health, safety and morals; that such areas contribute substantially to the spread of disease and crime; that the menace is beyond remedy and control by the exercise of the police power and cannot be effectively dealt with by private enterprise without state help; that the elimination of slums and the acquisition and preparation of land in slum areas and its sale for redevelopment are public uses and purposes for which public money may be expended and private property acquired § 4502.

These findings, though not conclusive in the courts, are entitled to great weight. *Wilmington Parking Authority v. Ranken,* 34 *Del.*

*Ch.* 439, 105 *A.2d* 614, 615. Plaintiff assails the finding that the slum evil cannot be remedied by the exercise of the police power. Unsanitary or unsafe buildings may be condemned, it is said, or their repair enforced by the vigorous enforcement of the building and health regulations. The answer to this is that to date neither the exercise of the police power nor the operation of private enterprise has abolished the slum. The legislature has now determined that a different and more far reaching remedy must be applied. We cannot say that such a finding is clearly unreasonable. It raises a question that is fairly debatable. Hence the legislative judgment must prevail. *State v. Hobson, 7 Terry* 381, 46 *Del.* 381, 83 *A.2d* 846; *General Electric Co. v. Klein,* 34 *Del.Ch.* 491, 106 *A.2d* 206.

Slum clearance, followed either by low cost housing or by private redevelopment, has become a recognized field for state action. With few exceptions, statutes conferring the power of eminent domain for the purpose have been upheld on the ground that the taking of private property to eliminate slums is a taking for public use. See the cases collected in the annotations in 130 *A.L.R.* 1069, 1077; 172 *A.L.R.* 966, 967; 44 *A.L.R.2d* 1416, 1420. In *Allydonn Realty Corporation v. Holyoke Housing Authority,* 304 *Mass.* 288, 23 *N.E.2d* 665, 668, the Supreme Court of Massachusetts expressly held that the taking of private property for the purpose of eliminating a slum was in itself a taking for a public purpose. The Court said:

> "We cannot say that expenditures directed in a rational manner towards the elimination of slums are not expenditures for a public purpose. It is unnecessary to dilate at length upon the pernicious influence of slums, upon the manner in which that influence may be found to reach out and to affect an entire community, lowering moral standards, and increasing the cost of all police, fire and health protection. The analogy between a slum and a public nuisance cannot be overlooked. Although the injurious effects of the former are less obvious and more insidious than those of the latter, they are likely to penetrate more deeply and to spread more widely. The abatement of a public nuisance may well be a public purpose. *Talbot v. Hudson,* 16 *Gray* 417, as

explained in *Lowell v. City of Boston,* 111 *Mass.* 454, 470, 471, 15 *Am.Rep.* 39; *Dingley v. City of Boston,* 100 *Mass.* 544."

We are in accord with this view. The "use" to which the land is put is the elimination of the slum. This Court stated in *Wilmington Parking Authority v. Ranken, supra,* that the phrase "public purpose" is not susceptible of precise definition and it is not possible to adopt a rigid rule by which to determine whether a public purpose or use is to be held public or private. In the case of *Allydonn Realty Corp. v. Holyoke Housing Authority, Mass., supra,* Chief Justice Qua, speaking of the distinction between public and private use, said: "Each case must be decided with reference to the object sought to be accomplished and to the degree and manner in which that object affects the public welfare."

It is not necessary for this Court to determine appellant's contention that the phrase "public use" is to be construed in a more limited sense than the phrase "public purpose". Assuming that it has the connotation suggested by appellant, we think, considering the findings of fact by the City Council, the purpose for which the Slum Clearance Act was passed and the Redevelopment Plan was approved, the taking of the properties in question would constitute a taking for a public use.

Second, is slum clearance or redevelopment the primary purpose of the act? We agree with plaintiff that the State may not constitutionally condemn private property if the primary purpose of the condemnation is the transfer of the property to private use. *Thomison v. Hillcrest Athletic Ass'n,* 9 *W.W.Harr.* 590, 39 *Del.* 590, 5 *A.2d* 236; *Wilmington Parking Authority v. Ranken, supra.* But in the light of the legislative findings, it is clear that it is slum clearance that is the serious evil that the act seeks to cure; and this, we think, is therefore the primary purpose of the act. Of course the act also looks to redevelopment, and has therefore a two-fold aim. But this subsequent redevelopment follows as a necesary consequence of the clearing of the area, since once the slum is cleared and the primary purpose of the act accomplished the Authority must do something with the land. Whether it should be thereafter devoted to strictly public

uses or transferred to private ownership is a matter for legislative determination. Control of the redevelopment designed to insure against a recurrence of the slums is provided for in furtherance of the primary purpose of the act, and to this limited extent public use of the land is continued after its sale to private developers.

That the development may confer an incidental benefit upon private persons does not avail to impair the force of the primary purpose or to invalidate the act. The present case is the not uncommon one in which public uses are combined with private uses or benefits. We considered such a case in *Wilmington Parking Authority v. Ranken, supra.*

In *Allydonn Realty Corporation v. Holyoke Housing Authority, supra,* it is said:

> "Frequently an object presents a double aspect in that it may in some respects result in conferring a benefit upon the public and in other respects it may result in conferring a benefit upon or in paying money to private individuals. In such instances the cases tend to distinguish between those results which are primary and those which are secondary or incidental and to classify the object according to its primary consequences and effects. At any rate it is plain that an expenditure is not necessarily barred because individuals as such may profit, nor is it necessarily valid because of incidental benefit to the public."

The redevelopment of cleared slum areas by private ownership has become a recognized feature of slum clearance. The constitutionality of statues combining slum clearance with private redevelopment has been sustained in nearly all the states in which it has been considered, more than twenty in number. See the cases collected in the *A.L.R.* annotations referred to above. Although there is some difference in the reasoning by which the question is resolved, the prevailing trend is that here taken, viz.: that slum clearance trend is the dominant or primary purpose of such acts, and redevelopment is a subordinate purpose, linked to the primary purposes by provisions

designed to prevent the recurrence of the slum, but a subordinate purpose necessitated by the need to put the land to some use. Examples of decisions so holding are the following:

*Belovsky v. Redevelopment Authority,* 357 *Pa.* 329, 54 *A.2d* 277, 172 *A.L.R.* 953; *Hunter v. Norfolk Redevelopment and Housing Authority,* 195 *Va.* 326, 78 *S.E.2d* 893; *Crommett v. City of Portland,* 150 *Me.* 217, 107 *A.2d* 841; *Papadinis v. City of Somerville,* 331 *Mass.* 627, 121 *N.E.2d* 714; *Jeffrey Co. v. City of Milwaukee,* 267 *Wis.* 559, 66 *N.W.2d* 362; *In re Slum Clearance in City of Detroit,* 331 *Mich.* 714, 50 *N.W.2d* 340; *Opinion to the Governor,* 76 *R.I.* 249, 69 *A.2d* 531; *Rowe v. Housing Authority,* 220 *Ark.* 698, 249 *S.W.2d* 551.

■ Before concluding our discussion of the first group of questions, we must notice a subsidiary point raised by question (c).

Plaintiff's property is a sound and safe structure. It is to be taken by the Authority only because it is within the slum area as defined in the plan. Plaintiff accordingly argues that even if the Authority may condemn and raze sub-standard structures, it may not lawfully take and destroy a building that is neither sub-standard nor unsanitary.

This argument overlooks the fact that in condemning property to eliminate a slum the act requires the Authority to deal with an area, not with separate individual buildings. The test of the existence of a slum is the substantial preponderance of unsafe and unsanitary structures in the area. That the application of this test bears hardly upon an owner of sound property is undoubtedly true; but hardship may always exist when the power of eminent domain is exercised. The legislature has determined that the feasible method of accomplishing slum clearance is by clearing an area; and we cannot say that such a determination is manifestly unreasonable.

This contention has been many times raised and consistently rejected. See, among others, the following cases:

*Berman v. Parker,* 348 *U.S.* 26, 75 *S.Ct.* 98, 99 *L.Ed.* 27 ; *Stockus v. Boston Housing Authority,* 304 *Mass.* 507, 24 *N.E.2d* 333, 336; *State ex rel. Bruestle v. Rich,* 159 *Ohio St.* 13, 110 *N.E.2d* 778, 789 ; *Gohld Realty Co. v. City of Hartford,* 141 *Conn.* 135, 104 *A.2d* 365 ; *Hunter v. Norfolk Redevelopment and Housing Authority,* supra.

The answer to the other questions in this group will naturally follow the answer to the broad question we have discussed. We are of opinion that the condemnation of private property for slum clearance and its redevelopment by private interests under conditions designed to prevent recurrence of the slum, and the use of public funds for the purpose, are constitutional.

■ But we expressly confine this holding to the sections of the Slum Clearance Act here before us. The questions submitted to us are very broad. They apparently call for an opinion on the validity of every provision of the Act. Such an opinion we decline to give, because we do not think that the certification provision of our Constitution (Art. IV, Sec. 11 (9) was intended to require us to answer questions not presented by the facts before the court below. Our rule provides for the certification of questions "arising in the cause".

Accordingly, the finding of constitutionality here made is limited to those sections of the act applicable to the facts presented. There are other sections of the act the application of which would certainly raise much more doubtful questions. For example, the act undertakes to grant the power of eminent domain to eliminate a "blighted area", as that term is defined in § 4501. A "blighted area" is one embodying "any combination" of ten factors or conditions set forth in the section. Only two of these appear to have any direct relation to public health, safety or morals, i. e., unsanitary or unsafe conditions, and conditions endangering life or property by fire or other causes. These factors, however, add nothing to the definition of a slum area in the same section. The other factors, such as "defective or inadequate street layout", "diversity of ownership", "tax or special assessment delinquency exceeding the fair value of the land", "unusual conditions of title", "improper subdivision", etc., have no direct relation to public health,

safety or morals. They seem to reflect the idea that the State may take A's property away from him for such diverse reasons as that it is not used in the most efficient or economical manner, or is in a district improperly or inartistically laid out, or is in an area including some properties having "diversity of ownership", and may sell it to B so that B may develop it in a more efficient manner.

Now, the City Council by one of its resolutions determined the Poplar Street project to be a "slum and blighted area". Presumably, this reference to "blighted area" is based on the finding of the existence of the two conditions first above referred to relating to unsanitary or unsafe conditions, and danger of fires. We expressly disclaim any implied approval of the finding that the Poplar Street project area is a "blighted area", or that condemnation of plaintiff's property could rest upon such a finding. We have the very gravest doubt of the right of the State under our Constitution to condemn private property on the eight grounds which are set forth in the definition of a "blighted area" above referred to, and which have no direct relation to public health, safety or morals. *Crommett v. City of Portland,* supra.

A somewhat similar comment may be made on the provision of § 4529, authorizing the acquisition of undeveloped vacant land "not within a slum or blighted area". At all events we do not in this opinion sustain the validity of that section.

Answers to the first group of questions will accordingly be appropriately limited as above indicated.

The remaining questions certified to us raise various objections to the validity of the act, and to the proceedings taken under it. These objections are all unsubstantial, and require only brief notice.

▉ Question (h) is as follows:

"Is the Redevelopment Law, which authorizes the Defendants (i) to determine conditions of slum or blight and the extent of the slum or blighted areas, (ii) to fix the terms of the Rede-

velopment Plan, (iii) to select purchasers and lessees and to establish conditions of the lease and purchase, and (iv) to fix the sales price or rentals therefor, unconstitutional as involving the delegation of legislative power to the defendants in violation of Article 2, Section 1 of the Constitution of the State of Delaware which vests legislative power in the General Assembly?"

The objection is that the legislature has failed to prescribe reasonably definite standards for the guidance of the municipality and of the authority in respect of the matters specified in the question.

(i) It is said that the word "preponderance" in the definition of a slum area is, in relation to the number of sub-standard structures in the area, too vague to constitute any guide to the determination of the existence of a slum. The word, of course, imports not merely a numerical majority of the structures; taken in connection with the rest of the definition (§ 4501, quoted above) it requires a finding that the existence of the sub-standard structures creates a prevailing condition in the area detrimental to public health, safety, or morals. The description of a sub-standard structure is reasonably definite in detail. We think the definition of a "slum" sufficient.

(ii) The standard applicable to the terms of the redevelopment plan is said to be inadequate because the plan is required only to be "sufficiently complete to indicate its relationship to definite local objectives as to appropriate land uses" etc. § 4520. This is not the only standard prescribed by the statute. On the contrary § 4520 specifies six items of information that must accompany the plan. These are (1) the boundaries of the area; (2) a land use plan; (3) statistical data; (4) proposed changes in zoning, street layouts, etc.; (5) a site plan; and (6) data respecting public utilities. This is definite enough to satisfy the most exacting standard.

(iii) It is said that there are no standards to guide the Authority in fixing the conditions applicable to the redevelopment of the area, because the only standard fixed for the conditions and restrictions to be imposed upon the developer are those that the Authority may deem

to be "in the public interest" or "to carry out the purposes of this chapter". § 4527. The purpose referred to is obviously "the prevention of the recurrence of slum * * * areas". § 4527. Of course the Authority is granted a broad discretion in determining such conditions, but this is necessarily so. Differing circumstances may require different conditions. We see no improper delegation of power.

(iv) This point, relating to the fixation of sales prices or rentals, is not developed on the brief. The statute requires that the land shall be sold or leased "at its fair values". What more could be said?

The answer to this question is "No."

██ ██ Question (i) is as follows:

"Is the Redevelopment Law, and particularly Section 4527 thereof, which authorizes the disposal of real property in the Redevelopment Project Area to private persons by the Defendant Authority, at its 'fair value', which may be less than the cost to the Defendant Authority of acquisition, demolition and preparation of such land for disposal, unconstitutional as involving the lending of the credit of a city or municipality to a private person, corporation or company in violation of Article 8, Section 8 of the Constitution of the State of Delaware?"

The act provides for the sale or leasing of the land in the condemned area at its "fair value". This means, of course, its value after the demolition of the buildings. Because this price will almost certainly be less than the price paid the owner on condemnation, plaintiff asserts that the purchaser has received a monetary grant from the City or from the Authority, in violation of the constitutional provision (Art. VIII, § 8) forbidding a municipality to appropriate money or lend credit to a private person or corporation.

We are at a loss to follow the argument. The Authority condemns the land, paying full value for land and building, and demolishes the building. The land alone is then sold for its fair value. How will the purchaser of the land, who pays full value for it, receive any credit or loan of the money expended to acquire and demolish the building?

This argument is without substance.

The answer to this question is "No".

Question (j) is as follows:

"Are the resolutions, ordinances, plans, contracts, findings, acts, things and doings of the Defendants acting purportedly under the Redevelopment Law illegal and void because of failure to follow the procedure set forth and required under the Redevelopment Law?".

Three objections are made to the proceedings taken under the act.

(i) The act provides (§ 4525) that a plan of redevelopment is to be approved by "the governing body" of the community. In this case it was approved by City Council. Plaintiff says that the Wilmington City Council is not the "governing body" of the City of Wilmington, because it has not complete authority over all municipal functions, its general authority being shared with the Street and Sewer Department, the Public Utility Commission, and other departments. In effect, plaintiff says that the City of Wilmington has no governing body, as that term is defined in the act, i. e., a "legislative body charged with governing the municipality". § 4501.

The existence of one or more city departments having special and limited powers of legislation in certain special fields of action such as streets and sewers, does not change the fact that the Council of the City of Wilmington is, in the general sense, the "governing body" of Wilmington. It would be highly unreasonable to say that the legislature intended to exclude from the provisions of the act every municipality that had a special department or board with legislative powers in a limited field. The reference is to the body having general governing powers under the municipal charter. In Wilmington that body is the Council.

(ii) The act provides (§ 4519):

"An Authority shall not recommend a redevelopment plan to the governing body of the community in which the redevelop-

ment project area is located until a general plan for the development of the community has been prepared."

It further provides (§ 4521) :

"Prior to recommending a redevelopment plan to the governing body for approval, an Authority shall submit such plan to the planning commission of the community in which the redevelopment project area is located for review and recommendations as to its conformity with the general plan for the development of the community as a whole."

The plan was in fact submitted to the Wilmington Planning Commission, as heretofore stated, and was approved. The objection is that the Wilmington Planning Commission has not yet adopted a comprehensive or general plan of development of the city, and has adopted only four parts of such a plan only one of which is citywide in scope.

We have examined the four parts of the Commission's plan and are satisfied that they embody a sufficiently general plan of development to comply with the statute. The purpose of requiring approval by the Planning Commission is, we think, to ensure the compliance of the plan with the statutory requirement that it shall indicate its relationship to local objectives. § 4517.

■■■ (iii) Finally, it is said that the plan contains a provision that it may be modified by the Authority with the consent of the developer, and that by this provision the City Council has delegated to the Authority Council's duty to consider and approve the plan. The plan does contain such a provision (paragraph I), which is lifted from the act itself (§ 4526) ; but the act also provides that where the proposed modification will substantially change the plan as previously approved the modification must be similarly approved by the governing body (§ 4526). This provision overrides the contract and refutes any suggestion of improper delegation of Council's authority.

The answer to this question is "No".

■ Question (k) is as follows:

"Is the Redevelopment Law unconstitutional and void as embracing more than one subject both in 48 *Del.Laws., Ch.* 345 and as carried forward in 31 *Del.C.* §§ 4501-4543, in violation of Article 2, Section 16 of the Constitution of the State of Delaware?"

The real objection here is that the title of the act (48 *Del.L.Ch.* 345) fails to express sufficiently one of the purposes of the act, viz.: to exempt the property of the Authority from levy and sale by execution or other judicial process. See § 4535.

The title is too long to quote here. It is a catalogue of the various purposes of the act. The first part of the title reads as follows:

"An Act To Provide For The Clearance Of Slum And Blighted Areas For Redevelopment In Accordance With Plans Approved By The Governing Body Of The City, Town Or County; To Create For This Purpose A Public Body Corporate And Politic, To Be Known As The Slum Clearance And Redevelopment Authority, In Each City, Town And County Of This State; To Define The Duties, Liabilities, *Exemptions,* And Powers Of Such Authorities, * * *." [Emphasis supplied.]

The specific reference to the subject of exemptions puts any reader on notice that the act deals with the very subject that plaintiff says is omitted.

This objection is obviously devoid of merit.

The answer to this question is "No".

■ Question (1) is as follows:

"1. Is the Redevelopment Law, and the resolutions, ordinances, plans, contracts, findings, acts, things and doings under color of the said Law unconstitutional and void as having no

substantial relation to the evil sought to be remedied and not reasonably calculated to attain the desired objective, in violation of Article 1, Section 9 of the Constitution of the State of Delaware and the Fourteenth Amendment to the Constitution of the United States?"

Plaintiff contends that proceedings under the Slum Clearance Act will not cure the slum evil. She advances two arguments:

(i) It is said that the remedy of condemning and demolishing all the buildings in the area is not only harsh, but unnecessary because the bad condition of the buildings can be remedied by use of the police power.

This is not an argument that condemnation and demolition will not destroy the slum; it is the same argument before made that they serve no public use or purpose that cannot be achieved by other means. This argument we have already dealt with. The legislature has determined otherwise and its judgment must prevail.

(ii) It is said that there are no adequate safeguards to insure against the recurrence of the slum. On the contrary, as we have pointed out, it is the duty of the Authority under the act (§ 4516 (4) to cause the redevelopment to be carried out under such conditions as will prevent a recurrence of the slum. We must assume that the Authority will make every effort to impose such conditions.

It is said that the dispossession and relocation of the residents of the area will merely shift the slum to other parts of the city. This is pure speculation. The law requires a feasible plan of relocation of such residents to be submitted, and also impliedly requires, we think (as does the federal act), that they be suitably relocated before being dispossessed by condemnation and demolition. Again, we must assume that the Authority will bend every effort to relocate them in a suitable manner, in suitable housing.

 Plaintiff suggests that the whole process of condemnation, demolition and redevelopment will fail to eliminate some of the slum evils such as crime and juvenile delinquency. This may be a sound prophecy or it may not. It may well be true, as the Supreme Court of Georgia has said, that "juvenile delinquency exists on both sides of the railroad tracks";[1] but plaintiff's argument only goes to the wisdom of the legislation, which is not for us to pass upon.

The answer to this question is "No".

 The last three questions concern the attempt of the Wilmington City Council to repudiate its obligations under the City's agreement with the Authority. They are as follows:

"m. Does the resolution of City Council of The Mayor and Council of Wilmington, dated July 25, 1957, have the effect in law of rescinding or annulling either or both of the resolutions of City Council dated January 10, 1957, relating to Poplar Street Project A.

"n. If the resolution of July 25, 1957, does have the effect in law of rescinding or annulling the resolutions of January 10, 1957, does such rescinding resolution terminate or void (i) the contracts entered into prior to such rescinding resolution particularly the Cooperation Agreement between The Mayor and Council of Wilmington and Wilmington Housing Authority, and the Loan and Grant Contract between the Wilmington Housing Authority and the United States of America, all of which were executed pursuant to the resolutions of January 10, 1957, and prior to the resolution of July 25, 1957, and (ii) the other actions taken and things done by the defendants herein in reliance upon the resolutions of January 10, 1957, and prior to the resolution of July 25, 1957.

"o. Does the resolution of City Council of The Mayor and Council of Wilmington, dated July 24, 1957, modify, affect, terminate or annul the right, power and duty, if any of the defendants

---

1. *Housing Authority of City of Atlanta v. Johnson*, 209 *Ga.* 560, 74 *S.E.2d* 891, 894.

to proceed under the Redevelopment Law aforesaid with Poplar Street Project A, particularly in view of the contracts entered into by The Mayor and Council of Wilmington and Wilmington Housing Authority pursuant to and in reliance upon the resolutions of City Council dated January 10, 1957, and in view of the other acts and things done pursuant to and in reliance upon the said contracts and the resolutions of January 10, 1957?"

The facts have heretofore been set forth. The rescinding ordinance is vague in its terms, but we shall assume that it constitutes an attempt to deny the City's liability to carry out its obligations under its contract with the Authority.

Plaintiff argues first, that it is effective to relieve the City from its obligations under its contract, and second, that in any event its validity cannot be passed on here, since the Authority has an adequate remedy at law for damages.

Both points are clearly unsound. A municipal corporation can no more repudiate with impunity a lawful contract than can a private person or corporation. 5 *McQuillin, Municipal Corporations*, § 19.39. The suggestion that the Authority must be remitted to a suit for damages is likewise unacceptable. Monetary damage in such a case as this is not merely an inadequate remedy, but one wholly inappropriate. The jurisdiction of equity to enjoin a breach of contract if the legal remedy is inadequate is too well-established to require discussion. 4 *Pomeroy, Equity,* § 1341, § 1345a.

The answer to each of these three questions is "No".

Before concluding this opinion a comment must be made upon the use of the certification proceeding in such a case as the instant one.

As the case developed, after the appendices to the certification were filed, it appeared that it had been impossible to comply with the

provisions of paragraph (3) *Rule* 20 of this Court, *Del.C.Ann.*, relating to the contents of a certification. Our rule contemplates that a certification shall contain a "concise statement of the facts" and a "concise statement of the question or questions of law" to be determined.

Because of the involved background of the case it was necessary for counsel to submit an appendix to the certification of nine parts, to which were attached a very large number of exhibits containing in great detail all of the proceedings leading up to the adoption of the plan and the manifold records and documents supporting it. It has been necessary for the members of the Court to grapple with these exhibits in order to deal satisfactorily with the case; and to do so without the benefit of the views of the court below.

The number of questions certified, as above shown, totalled 15, although they were susceptible, as appears from the opinion, to grouping.

We suggest to the courts and to counsel that such a case is more appropriately handled by a trial in the first instance than by an attempt to certify such a voluminous record to the Supreme Court.

In making this comment we have not the slightest criticism of the court below, nor of counsel. Under the rule this Court may accept or decline the certification. It was our decision to accept this certification because of the importance of the questions presented. This case was not the first of the kind that we have accepted; and the sole purpose of this comment is to notify the courts below of our intention to adopt in the future a stricter policy in approving certifications.

An order will be entered certifying our answers to the Court of Chancery of New Castle County.

WOLCOTT, Justice (dissenting) : I do not agree with the answers given to the certified questions of law by the majority of the court. The fundamental issue raised by the certified questions whether or

not the state's power of eminent domain may be delegated to the Wilmington Housing Authority and exercised to accomplish the purposes of the Slum Clearance and Redevelopment Authority Law (31 *Del.C., Ch.* 45).

The power of eminent domain possessed by a state is a limitation on the constitutionally guaranteed right of the individual to undisturbed private ownership of land. Every citizen is guaranteed that right. The right of the individual, however, is subject to the higher right of the sovereign to take privately owned land for use by the public. The power of the state, however, is not unrestrained. It is confined to instances in which the public benefit to be derived from the use of the property may be said to override the right of the individual to undisturbed ownership. Under our Constitution the state may condemn private property for the sole reason that the public benefit demands its use by the public.

These propositions are so fundamentally imbedded in our constitutional law that all courts unite in agreement upon them, as does the majority of this court in its answers to the certified questions.

The disagreement within this court in this litigation arises over the question of what is a "public use". The majority of the court says that the acquisition by condemnation of the alleged slum area in question, and the razing of the structures erected within that area, makes the taking of the individually-owned property comprising the area the taking of land for a "public use", since the result will be the elimination of a slum in the City of Wilmington. The ultimate requirement of the plan of redevelopment that the land, or at least a major portion of it, be sold to private owners for redevelopment in accordance with a preconceived plan of redevelopment, the majority says, is a mere incident to the legitimate exercise by the Wilmington Housing Authority of its delegated power of eminent domain. It is with this conclusion of the majority that I am unable to agree.

It is apparent that this plan of redevelopment, which is quite clearly authorized by the provisions of the Redevelopment Law, is

designed to accomplish the elimination of a slum and the redevelopment of the area along lines thought to be an improvement and thus a public benefit. But this is not to say that the condemned land has been put to a "public use" unless we accept as a definition of that phrase vague generalities couched in terms of "general welfare", "public purpose", or "public benefit". The scheme proposed differs materially from the usual public low-rent housing project for the less economically fortunate in that it does not contemplate retention of ownership and management by public authority. Retention of ownership and management by public authority would certainly come closer to actual use of the land by the public, since the public interest would be a continuing one for the future.

I will agree that the elimination of slum areas in a community is socially and economically commendable and is, generally speaking, a public purpose. But this plan of redevelopment contemplates that the Wilmington Housing Authority, in exercising the delegated power of eminent domain, shall act merely as a conduit of title from one private owner to a different private owner. The public interest, or use, ceases once the land is acquired and the structures destroyed. That this is the fact is conceded by the majority since it upholds the subsequent sale provisions to private owners on the ground that the Authority has to do something with the land when its purpose of eliminating a slum has been achieved.

The majority says it is unnecessary to decide whether "public use" is to be defined in a more limited sense than "public purpose" because of certain fact findings of City Council regarding the existence of a slum in the area to be condemned. But despite this disclaimer, it is apparent that the effect of the answers given by the majority is, in actuality, to redefine the phrase "public use" in terms of "public purpose" or "general welfare". This means that henceforth the state may exercise its power of eminent domain in order to further any of the varied activities regulated under the police power. I think it accurate to state that to date no court has gone so far as to hold that eminent domain may be exercised solely for the purpose of aiding the police power.

The majority of this court now seems to so hold. The answers given to the certified questions would seem to lead by logical progression to the conclusion that as long as there are sufficient legislative statements of fact and purposes present, the power of eminent domain may be exercised in aid of the general welfare, irrespective of the ultimate use to which the land is to be put, and irrespective of the ultimate ownership to which the land is to be transferred.

This, in my opinion, effectually destroys the constitutionally guaranteed right to own property. In my opinion, the passage of time, changing economic conditions, and sociological theories, do not, and in all right should not, justify the drastic altering of constitutional guarantees by an insidious erosive process. The Constitution, itself, prescribes a method for amendment. There is no constitutional sanction for a casual step-by-step amendatory process which, in time, inevitably will emasculate constitutional safeguards intended to be bulwarks against unbridled governmental interference with private rights.

In a sense, the majority of the court recognizes this in its caveat noted to those sections of the Redevelopment Law which purport to authorize the acquisition of so-called blighted areas and vacant and undeveloped land in order to permit its redevelopment. The majority draws a distinction between the acquisition of non-slum areas for the purpose of redevelopment and the acquisition of slum areas for the purpose of redevelopment, saying that the public use arises from the public purpose of slum elimination.

I do not think the Law is subject to this dismemberment. Nor do I believe that a reading of the act in full will support the conclusion that its primary purpose is the promotion of the general welfare by the elimination of slums.

The major emphasis in the act as a whole is on the redevelopment of the areas. As a matter of fact, outside of a definition contained in the first section of what a slum area is, and the necessity of some legislative findings by the governing body of the community that a slum area exists, the entire balance of the law is devoted to the method of

preparing a redevelopment plan and the powers of the Authority to put it into effect. The conclusion is inescapable that far from the ultimate redevelopment of the area being an incidental consequence of the clearance of slums, as the majority of the court says, the fact is that the clearance of slums is a mere incident to the redevelopment of an area which, in the opinion of the planners running the show, has been developed in an improper manner. The act is an instance of the modern trend to do everything by governmental authority and to force the public to comply with social planning. This may be a desirable method of proceeding and governing but, in my mind, it requires the disregard of certain of our constitutionally guaranteed rights.

Furthermore, certain facts in the record before us point up the fact that the plan of redevelopment before us fundamentally is one for the redevelopment of an area along more acceptable lines, and not, as is contended, fundamentally a plan for the elimination of a slum. While there are no specific findings of fact before us because of the nature of the certification procedure, nevertheless, it is apparent from the voluminous record appended to the certification that, while there may be slums in this area, the entire tract is by no means a slum.

For example, the property owned by the plaintiff is located at the intersection of Sixth and Spruce Streets, which is the extreme southeast corner of a projection of the area in question. The plaintiff's property is admittedly not sub-standard but, on the contrary, complies with the various building and sanitary codes of the City of Wilmington. This property is to be acquired, however, because of the desire for an integral area for purposes of redevelopment.

Similarly, the northwestern corner of the block bounded by Walnut, Poplar, Eighth and Ninth Streets, which block comprises the extreme northwest corner of the area in question, contains a warehouse, or factory building, and a parking lot. The building and parking lot are not architectural gems but they are certainly not a slum. In the absence of a trial on the facts in the court below and a determination of these issues it is impossible to say how much more of the area pro-

posed to be condemned could have been demonstrated not to be slum property.

All of this points up the fact that the emphasis in the contested law is not on slum clearance but is upon the redevelopment of the area along lines thought to be more economical and desirable. The fact that in the process a slum may be eliminated might almost be described as happenstance. It, therefore, seems to me that the entire law is subject to the caveat the majority of the court has raised as to the provisions of the law authorizing the acquisition by condemnation of property located in a blighted area, or undeveloped property necessary to be used in the proper redevelopment of the condemned area, on the ground that such a taking might well be a taking for private use.

Other grounds of attack were urged by the plaintiff, one of which is disposed of rather summarily by the majority of the court. This is that the elimination of slums—if that is the prime purpose of the law—could well have been accomplished by the exercise of the police power of the municipality. The answer given to this objection is that to date the police power has not abolished the slum. I point out that there is now showing in this record that any effort has been made to abolish slums through exercise of the police power. If any inference is to be drawn, it must not be that the police power is inadequate, but that it has not been tried.

I am aware that a large majority of the states which have passed upon similar laws have upheld their constitutionality. I am reluctant to be at odds with the main stream of judicial decision but of the reported decisions some are clearly distinguishable, and with respect to the others I am unable to agree with the reasoning expressed in them any more than I am able to agree with the majority of this court.

For the foregoing reasons, I register my dissent to the answers given by the majority of the court to the certified questions, excepting question designated (h), (j), (k), (m), (n) and (o), in the answers to which I concur.