**WILMINGTON HOUSING AUTHORITY,**
Plaintiff,

v.

**NOS. 500, 502 AND 504 KING STREET, and Nos. 503, 505 and 507 French Street; Commercial Trust Company, a corporation of the State of Delaware, et al., Defendants.**

**WILMINGTON HOUSING AUTHORITY,**
Plaintiff,

v.

**NOS. 408 AND 410 KING STREET, and No. 411 French Street; Liebman and Company, et al., Defendants.**

Superior Court of Delaware.
New Castle.

May 14, 1969.

William D. Bailey, Jr., Wilmington, for defendant.

Januar D. Bove, Jr., and Morris Cohen, Wilmington, for plaintiff.

## OPINION

MESSICK, Judge.

Plaintiff, Wilmington Housing Authority, seeks by eminent domain to acquire certain of defendants' properties situated within a ten block area which City Council, pursuant to 31 Del.C. Ch. 45, has declared a slum. Defendants challenge the condemnation proceedings on the grounds (1) that the properties are sound, are located within a four block area which cannot be classified as a slum, and are compatible with plaintiff's redevelopment plans; (2) that if condemned, the properties will not be devoted to public use within a reasonable time; and (3) that plaintiff has made no bona fide efforts to acquire the properties through negotiation of a purchase price. For the reasons hereinafter set

forth, plaintiff will be allowed to proceed with condemnation.

In Randolph v. Wilmington Housing Authority, 37 Del.Ch. 202, 139 A.2d 476 (Sup.Ct.1958), the Supreme Court of this State considered a number of questions similiar to those now raised by defendants. Regarding properties to be condemned in a slum area despite their sound condition, the Court had this to say:

"* * * · (T)o eliminate a slum the act requires the Authority to deal with an area, not with separate individual buildings. The test of the existence of a slum is the substantial preponderance of unsafe and unsanitary structures in the area. That the application of this test bears hardly upon an owner of sound property is undoubtedly true; but hardship may always exist when the power of eminent domain is exercised. The legislature has determined that the feasible method of accomplishing slum clearance is by clearing an area; and we cannot say that such a determination is manifestly unreasonable." 139 A.2d 484.

■ Consequently, the fact that defendants' properties are sound and sanitary is no defense to plaintiff's condemnation proceedings.

■ Defendants further maintain that the subject properties are situated within a four-block area which does not exhibit a substantial preponderance of unsafe and unsanitary conditions. This simply is not so. The word "preponderance" in the definition of a slum area

"imports not merely a numerical majority of the structures; taken in connection

with the rest of the definition (§ 4501, * * *) it requires a finding that the existence of the sub-standard structures creates a prevailing condition in the area detrimental to public health, safety, or morals." 139 A.2d 485.

■ The record contains ample evidence in the form of Leedom B. Morrison's Planning Notebook, the final Project Report, the Health Department files, the affidavits of Harry A. Prosceno and Peter A. Larson, and the testimony at the Public Hearing, to support the conclusion that the prevailing conditions in the four-block area were detrimental to public health, safety and morals. In light of such evidence, defendants' calculations that the sub-standard structures occupied only ten percent of the square footage composing the four-block area is of no avail. The same must be said of their reliance on plaintiff's appraisal of the structures from the viewpoint of fair market value.[1]

■ However, even if the facts were as defendants claim, no different legal result would follow. For just as an individual building may be condemned even though it is sound and sanitary, so also several blocks may be included within the slum area for redevelopment purposes even though, in and of themselves, they do not exhibit quite the preponderance of unsafe and unsanitary conditions required to justify a taking. In the words of the United States Supreme Court:

"It is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a particular project area. Once the question of the

---

1. Of course, the ideal situation would be to have available for examination the site in question exactly as it existed before condemnation proceedings commenced and demolition destroyed the evidence. However, defendants had ample opportunity to oppose the classification of these four blocks as a slum area prior to the destruction of the buildings thereon. Having failed to voice any opposition when invited by public notice to do so at a meeting held for that purpose, and having failed thereafter to take photographs or gather other pertinent evidence, defendants cannot very well expect the Court now to halt the project on the basis of a square footage calculation and a fair market appraisal of the sub-standard structures when neither of these factors has any conclusive bearing on the neighborhood as a slum.

public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch." Berman v. Parker, 348 U.S. 26, 35, 75 S.Ct. 98, 104, 99 L.Ed. 27 (1954).[2]

▮ Nor can defendants successfully oppose eminent domain on the grounds that their buildings are compatible with the land use envisioned. True, the retail sales business in which defendants' properties are currently engaged is similar to the uses proposed by the redevelopment plan. But permitting defendants' buildings to stand would prevent optimum development of the surrounding area. Defendants attempt to discredit this argument by equating it with the idea, emphatically disapproved in *Randolph,* that

" * * * the State may take A's property away from him for such diverse reasons as that it is not used in the most efficient or economical manner, or is in a district improperly or inartistically laid out, or is in an area including some properties having 'diversity of ownership,' and may sell it to B so that B may develop it in a more efficient manner." 139 A.2d 484, 485.

▮ Such an equation overlooks the crucial distinction on which *Randolph* turns between primary and incidental objectives for redevelopment. Primarily, plaintiff seeks to clear a slum and to prevent its recurrence by the successful development of the surrounding area. This objective appears to be within reach if unified owner-ship, and artistic, efficient, and economical use of the land is permitted. Defendants have not shown that plaintiff's redevelopment plan is unreasonable, or an abuse of discretion, or aimed merely at the improvement of a so-called "blighted" area. Nor have they shown that an alternative plan leaving their properties undisturbed would have an equal chance of success. Even if such an alternate plan existed, it would not be for the Court to substitute its judgment for that of the legislative branch of the government as to which plan was best. In re Bunker Hill Urban Renewal Project I B, 61 Cal.2d 21, 37 Cal.Rptr. 74, 389 P.2d 538 (1964). Accordingly, defendants first grounds for challenging condemnation must be regarded as without merit.

The answer to defendants' second contention, like the answer to their first, is found in *Randolph.* The Supreme Court sustained 31 Del.C. Ch. 45 precisely because the clearing away of a slum, rather than the redevelopment of a run-down area, was the primary purpose of that Chapter. The Court's decision stands for the proposition that land cleared of sub-standard buildings is thereupon devoted to public use, even if never thereafter redeveloped. Consequently, defendants cannot cite the DuPont Street and Poplar Street areas as examples of plaintiff's failure to put condemned land to public use within a reasonable time.

▮ Of course, demolishing defendants' buildings will not contribute to the further, immediate elimination of a slum, because these buildings are not sub-standard. Nevertheless, since the developer se-

2. The similarity of rationale between *Berman* and *Randolph* is especially apparent from the dissent in *Randolph.* To the dissent, inclusion of sound properties or areas within the redevelopment project seemed merely to point up "the fact that the emphasis in the contested law is not on slum clearance but is upon the redevelopment of the area along lines thought to be more economical and desirable." 37 Del.Ch. 232, 139 A.2d 492. But the majority upheld the law, recog-nizing that not only must a slum be cleared, but also that its recurrence must be prevented by careful redevelopment which may require the acquisition of some sound property. A well reasoned application of the *Berman* rationale may be found in Eikenbary v. City of Dayton, 3 Ohio App.2d 295, 210 N.E.2d 402 (1964), wherein the inclusion of a sound area of 12.5 acres in a slum area of 36 acres was upheld.

lected by the city to manage the project cannot begin until the entire tract is placed at his disposal, demolition of these buildings will promote the public interest by bringing the plaintiff further along its plans to prevent not only the recurrence of the slum area in question but also the further development of slums or potential slums elsewhere in the city through revitalization of the downtown business district. Defendants point out that the developer also needs a direct link between the project and Interstate 95 before he can begin. But it is not for the Court to substitute its discretion for that of the municipality regarding the order in which the necessary steps are taken to accomplish a valid project. Under the circumstances, sufficient public use of the condemned land will accrue upon its acquisition by the plaintiff to justify eminent domain.

Defendants' third objection to the taking of their property is hardly appropriate, considering the defendants' own failure to promote meaningful negotiations with the plaintiff. Although, as defendants allege, plaintiff's initial offer to purchase one property was based on an incomplete appraisal, plaintiff did invite defendants to negotiate at a revised figure after a complete appraisal had been made. The fact that federal regulations prevent plaintiff from actually tendering a firm offer does not excuse defendants' failure so much as to acknowledge plaintiff's invitation to negotiate. If the purchase price which plaintiff had in mind was still inadequate, defendants could have said as much and indicated the price at which they were willing to sell. Since they chose to remain silent, the Court has no sympathy with their charge that plaintiff has refused to make a bona fide effort to purchase the property.

Defendants' objections to the condemnation of their properties must therefore be overruled.

It is so ordered.